

FILED

July 26, 2018

TN COURT OF
WORKERS'
COMPENSATION
CLAIMS

1:34 P.M.

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MEMPHIS

| | | |
|---|---|---|
| FLOYD McCALL, | ) | Docket No. 2016-08-0214 |
| Employee, | ) | |
| v. | ) | |
| FERRELL PAVING CO., | ) | State File No. 79060-2014 |
| Employer, | ) | |
| And | ) | |
| PHOENIX INS. CO., | ) | Judge Amber E. Luttrell |
| Carrier. | ) | |

## COMPENSATION HEARING ORDER

This matter came before the Court for a Compensation Hearing on June 21, 2018. The central legal issues are whether Mr. McCall established by a preponderance of the evidence that his need for cervical surgery arose primarily out of and in the course and scope of his employment at Ferrell Paving and whether he is entitled to: past temporary and medical benefits for his neck surgery; permanent partial disability for his neck, shoulder, and elbow; and future medical benefits. For the reasons below, the Court holds that Mr. McCall did not meet his burden of proof. Thus, he is not entitled to the requested benefits.

### History of Claim[1]

Mr. McCall worked as a cement truck driver for Ferrell Paving. While performing a pre-trip inspection on October 6, 2014, he stood on the truck tire to check under the hood, lost his balance, and fell approximately four feet to the ground. Mr. McCall stated he fell onto the left side of his body. The parties stipulated Mr. McCall timely reported the incident, and Ferrell Paving authorized initial medical treatment at Concentra.

Mr. McCall next underwent authorized treatment with Dr. Riley Jones, whom he selected from a panel of orthopedic physicians. He later sought unauthorized treatment with Dr. Glenn Crosby, who performed neck surgery in 2017, and sought two evaluations and treatment from Dr. Apurva Dalal. Lastly, Mr. McCall underwent an independent

---

[1] The hearing testimony and exhibits established the facts set forth in the History of Claim section.

1

medical evaluation at Ferrell Paving's request with Dr. John Brophy.

The parties took the depositions of Drs. Jones, Crosby, Dalal, and Brophy and introduced the following medical proof regarding Mr. McCall's treatment, whether his need for cervical surgery primarily arose out of his work injury, and whether he sustained any permanent impairment from the work injury.

*Medical Treatment and Physicians' Testimony*

Mr. McCall first saw Dr. John Hayes at Concentra and reported a history of injury to his shoulder, arm, and neck. Dr. Hayes diagnosed shoulder and scapular contusions and ordered physical therapy.

Mr. McCall returned to Dr. Hayes on three more occasions for neck and shoulder symptoms but did not report any elbow complaints. Dr. Hayes noted cervical x-rays showed degenerative changes and diagnosed a cervical strain and shoulder contusion. Dr. Hayes then referred him for an orthopedic evaluation, and commented, "[T]his is being done because of little improvement with conservative treatment—I am having difficulty correlating [symptoms] with reported injury."

*Dr. Jones[2]*

*Treatment*

Mr. McCall saw authorized panel physician Dr. Jones nine times over five months for treatment of his shoulder, arm, and neck. Mr. McCall first saw him shortly after his injury and reported symptoms of aching pain and numbness. Dr. Jones testified Mr. McCall's neurologic exam was normal other than degenerative findings. He had good strength, normal reflexes, and intact sensory findings.

Mr. McCall's shoulder exam indicated a positive Speed's test and tenderness but no other findings. Shoulder x-rays showed mild degenerative joint disease with an os acromiale with a degenerative acromioclavicular joint. Dr. Jones defined the os acromiale as follows:

> [A]n os acromiale is something we look for when we have impingement, and it is a failure of the bone to totally calcify when someone's growing, but it also gives a beaking over the rotator cuff. So, as they work through range of motion, a lot of times they get impingement symptoms.

---

[2] Dr. Jones is a board-certified orthopedic surgeon who testified he performed many shoulder, elbow, and cervical spine surgeries, including cervical diskectomies and fusions, over the last forty years. He is a member of the Bureau's Medical Impairment Rating Registry.

Mr. McCall's only elbow finding was ulnar nerve pain.

Dr. Jones diagnosed cervicalgia and wanted to rule out tardy ulnar nerve palsy in the elbow.[3] He ordered an EMG/nerve conduction study and injected his biceps tendon. Mr. McCall underwent the EMG/NCS on November 12, 2014, and the results were normal, revealing no evidence of cervical radiculopathy or ulnar neuropathy.

To further evaluate Mr. McCall's condition, Dr. Jones ordered an MRI of the C-spine and the shoulder. Concerning the shoulder, Dr. Jones testified the MRI results indicated a "very small" rotator cuff tear and stated, "there's nothing really there to operate on, because it's not a full thickness tear." He opined that "most of these will heal with time." Dr. Jones found tendinosis, the os acromiale, and impingement, which he stated did not come from Mr. McCall's injury. Dr. Jones testified, "[T]his is wear and tear on an everyday basis with some things like the os acromiale and the degenerative acromioclavicular joint, which really are the . . . problem, and they're, basically, a degenerative process." Dr. Jones stated the impingement problems can cause slight rotator cuff tears. He stated, "[H]appens all the time. That's the most common cause."

Concerning the neck, Dr. Jones testified the MRI revealed moderate foraminal stenosis, which is degenerative not traumatic, and stated Mr. McCall's fall at work did not cause the condition. He stated, "[I]t couldn't have caused his foraminal stenosis. This takes months and months and years to develop to this point." Dr. Jones further testified, "[H]e's almost 60 years old at this point. You don't have anything . . . that shows a ruptured disc. You don't have anything that shows any radiculopathy, because we've already done the EMG. So what we have is a degenerative process."

Based on his findings, Dr. Jones recommended physical therapy and reasoned,

> because we pretty well ruled out anything bad. I don't doubt the man's sore. He fell . . . bruised some muscles, and he got some irritation; but as far as . . . a structural change in his neck, his elbow, and his shoulder on that fall, that was not. They are all, basically, pre-existing problems.

Following several months of conservative treatment, therapy, and work hardening, Dr. Jones testified Mr. McCall reported his symptoms improved but he still had mild aching. Dr. Jones referred him for a functional capacity evaluation, which indicated Mr. McCall "fell into the medium/heavy to heavy work range level" and stated that "would meet or exceed his job demands at Ferrell Paving." As a result, Dr. Jones returned him to

---

[3] Dr. Jones defined tardy ulnar nerve palsy as a "situation where you have some irritation of the nerve at the elbow . . . in the canal that the ulnar nerve comes through . . . And when you hit that [sic] nerve like I'm doing now . . . it causes shooting pain down there . . . and it affects primarily the little finger and half the ring finger on the outside. It causes some weakness in the muscles in between the fingers . . . that was the working diagnosis."

regular duty work on February 4, 2015.

Mr. McCall returned to Dr. Jones the following month and Dr. Jones ordered a repeat upper extremity EMG. He testified he "wanted to make sure we were not missing anything." The repeat EMG results were once again normal with no cervical radiculopathy or ulnar neuropathy. At that point, Dr. Jones concluded, "we pretty well ruled out any type of neurologic problem" and released him at maximum medical improvement (MMI) on April 13, 2015, with no restrictions. At Mr. McCall's last visit, he reported to Dr. Jones that he had occasional pain, but he was performing home exercises and working without limitations.

*Dr. Jones' testimony regarding permanent impairment and surgery*

After releasing Mr. McCall at MMI, Dr. Jones concluded he did not sustain any permanent impairment from his work injury. He testified that Mr. McCall's findings were pre-existing; he was sore from his fall, but the treatment returned him to his baseline and he did not sustain any structural change that would cause permanent impairment.

Dr. Jones further testified within a reasonable degree of medical certainty that Mr. McCall did not require neck, shoulder, or elbow surgery for his work injury.

Regarding the shoulder, Dr. Jones stated:

[Mr. McCall's] got impingement, but those are . . . degenerative changes. You've got arthritic changes in the acromioclavicular joint that have spurs, they preceded his injury. The os acromiale is a developmental problem which causes impingement, they preceded his injury . . . he's got a very small partial tear, and . . . it was just not caused by the trauma that we're talking about.

Regarding the elbow, Dr. Jones concluded surgery was unnecessary. He stated the EMG revealed no abnormalities and surgery is indicated on tardy ulnar nerves only if there were "absolute severe findings." He stated on exam, Mr. McCall had "no atrophy, no muscle wasting or anything else."

Regarding the neck, Dr. Jones testified Mr. McCall had a "progressive degenerative problem" from getting older. He stated,

[T]he injury didn't cause a structural change . . . There's no ruptured disc . . . . We're talking about bony problems and arthritic problems. And there's no fracture. Again, he improved; but he's always going to have some irritation in his neck just from what he has . . . You don't operate just on the arthritic changes. You operate on the neurologic changes. He did not have any

4

neurologic changes.

In Dr. Jones' deposition, Ferrell Paving's counsel informed him that Mr. McCall did not return to work for Ferrell Paving following his injury. He worked for Nike from February 2015 through May 2015, when he began working for Trane continuously until Dr. Crosby, his unauthorized physician, performed cervical surgery approximately two years later in March 2017. Dr. Jones agreed that Mr. McCall's later work activities "continuously pulling boxes weighing up to 15 pounds on and off a conveyor belt for an eight-hour shift five days a week" could have aggravated or exacerbated his pre-existing shoulder and elbow conditions and his cervical spondylosis and foraminal stenosis.

When asked specifically about Mr. McCall's subsequent cervical surgery with Dr. Crosby, Dr. Jones testified Mr. McCall's work injury did not cause the need for the surgery:

> He had no objective findings that would require a surgical procedure two and a half years before . . . [W]e have MRI's, . . . x-rays, and we . . . do not have the complaint . . . And you've got this long period of time between the time he had his injury and the time we let him go back to work before they did the surgery. And during that process, he was working, doing other things. And I suspect that those other things have more to do with it than just a fall flat on your back.

Dr. Jones also disagreed with Dr. Crosby's opinion, discussed below, that a portion of the facet joint collapsed on the nerve root from the injury causing the need for surgery. Dr. Jones testified the diagnostic studies did not show any facet joint collapse following the work injury and stated, "that's something that you would see on those studies." He stated the facet joint collapse referenced by Dr. Crosby "may be more of a degenerative thing than anything else." He stated, "[Y]ou're talking about a two and a half year period there that he's been working and doing . . . I don't know that you can relate that . . . to the injury . . . The time interval is too long." He went on to explain that it would have shown up on the MRIs and the pressure on the nerve root would have shown up as radiculopathy on the EMGs. He stated,

> But we didn't have that. Normally, you get a broke facet, and having had to wire so many of those back, I can tell you, it's an immediate deal. And . . . you're going to see it on the MRI. And you're going to have a lot more pain than what we're talking about here.

5

*Dr. Crosby*[4]

Mr. McCall first sought unauthorized treatment with Dr. Crosby for his neck on February 1, 2016, almost sixteen months after the work injury. Dr. Crosby reviewed the December 2015 MRI, noted it revealed stenosis, and recommended conservative treatment. Mr. McCall returned to Dr. Crosby eleven months later in December 2016 and reported worsening neck symptoms. Dr. Crosby did not know where Mr. McCall was working or his condition during the eleven-month period since his last visit. Dr. Crosby believed the spondylosis and symptoms were worsening, so he ordered another cervical MRI.

Mr. McCall underwent a third cervical MRI on January 13, 2017, which Dr. Crosby stated revealed, "multi-level spondylosis . . . C6-7 level on the left a disk osteophyte complex, and he had a compression of the neural foramen, which is the hole where the nerve is exiting the spine." Dr. Crosby confirmed the January 2017 MRI indicated a progression in severity from the December 2015 MRI, and he performed surgery on Mr. McCall's neck on March 23, 2017. In the operative report, he noted a portion of the facet joint collapsed on and was compressing the nerve root.

Dr. Crosby last saw Mr. McCall on May 17, 2017, for post-surgical follow-up. Dr. Crosby testified Mr. McCall "had done nicely with good resolution of his pain symptoms. He still had weakness in the left arm. I felt he was progressing nicely after surgery."

Regarding causation for the cervical surgery, Dr. Crosby initially testified as follows:

> While I recognize the fall in October of 2014, did not cause the cervical spondylosis – the foraminal stenosis at C6-7, it did aggravate or accelerate these problems to the point that surgery at that level was made necessary. In terms of a percentage, it is somewhere in the neighborhood of 75 to 80 percent caused by the fall at work[.]

Dr. Crosby further stated that he believed the facet joint collapse on the nerve root resulted from the fall. He stated that he based his causation opinion on what Mr. McCall told him.

On cross-examination, Dr. Crosby acknowledged that he never saw Mr. McCall's records from Drs. Hayes and Jones, the first two EMG/nerve conduction studies, or the cervical MRI ordered by Dr. Jones. After reviewing their records during his deposition, he agreed that Dr. Hayes found normal cervical range of motion, no cervical tenderness, and a negative spurling's test. Dr. Crosby stated these were different findings from when

---

[4] Dr. Crosby is a board-certified neurosurgeon.

he first saw him in February 2016. After reviewing Dr. Jones' records, Dr. Crosby testified that Dr. Jones' neurologic and upper extremity findings were also different from his February 2016 findings.

After a review of Mr. McCall's first two EMGs, Dr. Crosby testified they were normal and indicated no cervical radiculopathy. He agreed that the third EMG, ordered by Dr. Dalal in December 2015, was the first to show ulnar neuropathy. Dr. Crosby reviewed Mr. McCall's first two MRIs and agreed that his foraminal stenosis worsened from November 2014 to December 2015 and deteriorated further by the January 2017 MRI.

Dr. Crosby conceded he was not aware of the type of work Mr. McCall did between the date of injury and his first visit in February 2016. Mr. McCall did not inform Dr. Crosby that he never returned to work at Ferrell Paving and that he started working for Nike on February 1, 2015, and then Trane in May 2015. Thus, Dr. Crosby did not know that Dr. Jones released Mr. McCall to full-duty work in February 2015. Based on the diagnostic studies, he agreed that Mr. McCall's later employment activities could have caused the worsening of his cervical condition between his first and second visits in February and December 2016, when he first offered surgery.

Based on the new information, Ferrell Paving asked Dr. Crosby, "can you now say within a reasonable degree of medical certainty that the fall he had in October [2014] more than 50 percent aggravated his cervical condition that led to your surgical procedure?" Dr. Crosby revised his prior opinion and responded,

> Well, the findings in surgery with the collapsed facet joint are concerning, and they're more traumatic in origin than typical spondylosis worsening. So in hindsight going back to his original injury, I do think that the fall is still the majority cause of his cervical radiculopathy. I'm not as convinced of the effect of the ulnar neuropathy, in fact that seems to support more repetitive work using the arm[.]

In summary, Dr. Crosby stated, "[Mr. McCall's] worsening spondylosis . . . could have been aggravated or worsened over time from these other work conditions you've talked about. I think the facet joint collapse was traumatic, and I'm relating that to the fall." However, Dr. Crosby stated that he could not tell when the facet joint collapse occurred; he agreed that no MRI prior to his surgery showed a facet joint collapse. He stated it could have occurred after his fall at work.

Regarding impairment, Dr. Crosby reviewed Dr. Dalal's August 16, 2017, impairment evaluation, discussed below, and agreed with his assessment of twelve-percent permanent impairment for the cervical condition. He did not address impairment for the shoulder or elbow.

7

Mr. McCall first saw Dr. Dalal for an independent medical evaluation at his attorney's request before he began treatment with Dr. Crosby. Following an exam, Dr. Dalal diagnosed cervical stenosis, rotator cuff tear with AC joint arthritis, and ulnar neuropathy of elbow with medial epicondylitis. He assigned permanent impairment of twelve percent to the body for multilevel spinal stenosis with evidence of radiculopathy, five percent to the upper extremity for AC joint arthrosis with range of motion loss in the shoulder, and five percent to the upper extremity for ulnar neuropathy. He combined the ratings and assigned a total impairment of seventeen percent to the body.

Regarding causation, Dr. Dalal testified Mr. McCall's fall at work caused an aggravation of his pre-existing cervical spine disease causing cervical radiculopathy. Regarding the shoulder, Dr. Dalal stated the fall caused Mr. McCall's rotator cuff tear and aggravated his degenerative AC joint disease. Finally, he testified regarding the elbow, "he also developed ulnar neuropathy and developed medial epicondylitis after the fall." He further stated the fall "caused aggravation of his cervical spine disease and radiculopathy, also all other diagnoses which I just described by 80 percent." Dr. Dalal testified he based his medical causation opinion on Mr. McCall's history.

Concerning the shoulder, Dr. Dalal agreed that Mr. McCall had degenerative and congenital findings in his shoulder MRI that "can cause rubbing and fraying of the rotator cuff." He stated that "high incidences of rotator cuffs have been known to occur with os acromiale [but] not with AC joint arthrosis." However, he did not alter his previous opinion regarding causation for the rotator cuff tear.

On cross-examination, Dr. Dalal agreed that Dr. Jones' records indicated Mr. McCall improved with treatment between November 2014 and April 2015. Dr. Dalal stated that when Mr. McCall came to him for treatment in November 2015, he reported increased symptoms of shoulder pain, neck tightness, and shooting pain down his arm into his ring and pinky fingers. Dr. Dalal ordered a cervical MRI and EMG, which were performed in December 2015. He stated the EMG indicated ulnar neuropathy, which differed from Mr. McCall's first two normal EMGs, and his December 2015 MRI results were worse than his prior MRI ordered by Dr. Jones. Because Mr. McCall's symptoms worsened, Dr. Dalal referred him to Dr. Crosby.

Like Dr. Crosby, Dr. Dalal acknowledged that Mr. McCall did not inform him about his later work for Nike and Trane. Dr. Dalal agreed that Mr. McCall's repetitive pushing, pulling, reaching, and lifting at Nike and Trane could have aggravated or exacerbated his pre-existing cervical condition, shoulder condition, and ulnar neuropathy.

---

[5] Dr. Dalal is a board-certified orthopedic surgeon and member of the Bureau's Medical Impairment Rating Registry.

He also agreed that "something made Mr. McCall's condition worsen" from February 2015 until Dr. Crosby saw him and ordered surgery in December 2016. However, Dr. Dalal concluded that Mr. McCall's injury "aggravated everything" and the subsequent repetitive work "didn't help."

Dr. Dalal performed a second evaluation of Mr. McCall on August 16, 2017, following Mr. McCall's neck surgery with Dr. Crosby. Dr. Dalal did not revise his impairment opinion from Dr. Crosby's surgery and the successful result.

## Dr. Brophy[6]

Mr. McCall saw Dr. Brophy for an evaluation at Ferrell Paving's request in October 2017. Dr. Brophy took a history, reviewed his complete medical records and diagnostic studies, and examined him. Dr. Brophy also reviewed Dr. Crosby's operative report, noted he performed a left C6-7 foraminotomy, and stated it indicated no herniated disc.

On exam, Dr. Brophy found normal upper extremity strength, good cervical range of motion, intact sensory testing of the cervical spine, and a negative Tinel's sign. He noted pain with rotation and abduction of the left shoulder.

Based on the history, records review, and physical exam, Dr. Brophy diagnosed "left shoulder pain treated with physical therapy . . . left ulnar neuropathy at the elbow . . . and cervical radiculopathy secondary to multi-level cervical spondylosis, improved."

Dr. Brophy testified within a reasonable degree of medical certainty that Mr. McCall's ulnar complaints were unrelated to his fall at work. He stated the following:

> I don't think I remember seeing ulnar neuropathy related to a fall. It's usually a condition related to a fibrous band over the ulnar nerve that occurs over time; and . . . if it had been acutely injured as it relates to the fall, we would expect the first two EMGs to be positive.

Dr. Brophy agreed that Mr. McCall's later work as an order puller at Nike or picker at Trane could cause or aggravate ulnar neuropathy.

Dr. Brophy further testified that Mr. McCall's fall at work did not cause his cervical spondylosis or foraminal stenosis. He stated, "those findings are not related to a single incident. They occur over months and years by definition." He stated that his diagnosis of cervical radiculopathy secondary to multilevel spondylosis was more than fifty-one percent related to Mr. McCall's pre-existing condition, and the cervical surgery

---

[6] Dr. Brophy is a board-certified neurosurgeon.

was not related to or caused by Mr. McCall's 2014 fall at work.

Concerning Mr. McCall's need for surgery, Dr. Brophy stated, "[h]is degenerative changes at C6-7 had been progressing over the years and continued to progress no matter what job he was performing." He agreed with Dr. Jones' opinion that Mr. McCall's cervical and elbow conditions returned to baseline after treatment and "anything that happened after that was not related to this injury."

Dr. Brophy specifically addressed Dr. Crosby's testimony regarding "a portion of the facet joint collapsing on the nerve root." He stated, "[T]hat terminology I've never heard before, a collapse. What we see is narrowing of the foramen, in this case caused by degenerative changes. There was no evidence of trauma to the facet joint by MRI or CT scan. So it wasn't related to the fall, whatever he saw." Dr. Brophy testified that any problem to the facet joint from the fall would have appeared on the three MRIs Mr. McCall had before surgery. He explained, "The MRIs are quite sensitive to bone injury. There would be signal changes within the facet joint; and certainly if he had a clinical radiculopathy, Dr. Jones has seen thousands of those over the years and would have noted it also."

Finally, Dr. Brophy concluded Mr. McCall did not sustain any permanent impairment for his cervical condition or ulnar neuropathy related to the fall. He deferred to Dr. Jones' opinions regarding the shoulder. Dr. Brophy disputed Dr. Dalal's impairment rating for the cervical condition and stated that a twelve-percent rating implies weakness, which Dr. Brophy did not see on exam two months after Dr. Dalal evaluated him.

*Mr. McCall's Testimony*

Mr. McCall testified he still had symptoms when Dr. Jones released him. However, he acknowledged that he did not request to return for further treatment. He said he experienced no difficulty with his neck, elbow, or shoulder before his fall at work. He stated his neck pain resolved following surgery; however, he continues to experience symptoms in his shoulder and elbow. He stated he does not perform heavy lifting with his left arm and sometimes wakes up with pain on his side.

Mr. McCall acknowledged that he passed a medical exam in February 2015 to re-certify his commercial driver's license certificate. He further agreed that Dr. Jones released him to full-duty work in February 2015 and that he has worked regular duty since that time for Nike and Trane. Mr. McCall repetitively packs fans or other parts in boxes and puts them on a pallet. He stated he has no problems performing his job.[7]

---

[7] The parties disputed the reason why Mr. McCall is no longer employed by Ferrell Paving. Based on the Court's holding, however, this testimony was not relevant.

## Findings of Fact and Conclusions of Law

At a Compensation Hearing, the employee must establish by a preponderance of the evidence that he or she is entitled to the requested benefits. *Willis v. All Staff*, 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2017).

Mr. McCall seeks past medical expenses and temporary disability for his cervical surgery with Dr. Crosby. He also seeks permanent partial disability benefits and future medical benefits for his cervical, shoulder, and elbow conditions. For the following reasons, the Court finds Mr. McCall did not prove entitlement to these benefits by a preponderance of the evidence.

To prove a compensable injury, Mr. McCall must show that his alleged injury arose primarily out of and in the course and scope of his employment. To do so, he must show an incident, or specific set of incidents, identifiable by time and place of occurrence, caused his injury. Further, he must show, "to a reasonable degree of medical certainty that [the employment] contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes, as opposed to speculation or possibility." *See generally* Tenn. Code Ann. § 50-6-102(14).

Here, the parties agreed a specific incident occurred on October 6, 2014, when Mr. McCall fell from his truck tire onto the ground on his side. Ferrell Paving authorized treatment with Concentra and Dr. Jones for his neck, shoulder, and arm complaints. After multiple x-rays, two EMGs, MRIs of the cervical spine and shoulder, and extensive conservative treatment consisting of physical therapy, work restrictions, injections, medication, and work hardening, Dr. Jones placed Mr. McCall at MMI on April 13, 2015, with no restrictions.

Dr. Jones concluded Mr. McCall had symptoms from his fall but improved and returned to his baseline. Dr. Jones testified his diagnostic findings indicated pre-existing degenerative conditions in his neck and shoulder and he did not sustain any anatomic/structural changes resulting in permanent impairment. Dr. Jones further concluded that Mr. McCall did not require surgery for his neck, shoulder, or arm. As the panel-selected physician, Dr. Jones' opinions on causation and impairment are entitled to a presumption of correctness, rebuttable by a preponderance of the evidence. Tenn. Code Ann. § 50-6-102(14)(E).

Dr. Brophy agreed with Dr. Jones' opinions. From his examination and review of all the records and testing, Dr. Brophy concluded that Mr. McCall's cervical condition was more than fifty-one percent related to his pre-existing spondylosis and not the workplace fall. He further testified that his cervical surgery was not related to the fall.

11

Mr. McCall relied, in part, on the testimony of Dr. Crosby to rebut the statutory presumption afforded Dr. Jones' opinions. Notably, Mr. McCall first presented to Dr. Crosby for complaints of neck pain and tingling *almost sixteen months* following his work injury. At that time, unknown to Dr. Crosby, he performed repetitive work for subsequent employers, Nike and then Trane, for one year. Dr. Crosby recommended physical therapy, and Mr. McCall did not return to Dr. Crosby again until eleven months later. It was then that Dr. Crosby ordered an MRI, which indicated a progression in severity of his degenerative condition over his December 2015 MRI, and Dr. Crosby recommended surgery.

In support of his opinion that Mr. McCall's work injury led to the need for surgery in March 2017, *almost two and one-half years after his injury*, Dr. Crosby testified he found what he called a partial facet joint "collapse" compressing the nerve during surgery. He believed this condition was more traumatic in origin; thus, based on Mr. McCall's history, he attributed the facet joint collapse to the fall. Dr. Crosby ultimately concluded during cross-examination that Mr. McCall's later employment activities at Nike and Trane could have caused the progression/worsening of his cervical spondylosis and ulnar neuropathy between his first and second visits in February and December 2016. He testified that Mr. McCall's condition *did not* worsen during that period due to his workplace fall.

Mr. McCall also relied on Dr. Dalal's opinion that Mr. McCall's work injury "aggravated everything" by "80%" and led to permanent neck, shoulder, and elbow impairment. Dr. Dalal relied on Mr. McCall's history and acknowledged he did not know about Mr. McCall's repetitive work activities after leaving Ferrell Paving and had incomplete medical records.

The Appeals Board instructed that, "When faced with conflicting medical testimony, the Court must use its discretion in accepting one expert opinion over another and, in so doing, may consider which opinion contains the more probable explanation." *Sanker v. Nacarato Trucks, Inc.*, 2016 TN Wrk. Comp. App. Bd. LEXIS 27, at *12 (July 6, 2016).

After consideration of Mr. McCall's testimony, the totality of the medical proof, and the timeline, the Court finds Drs. Jones' and Brophy's testimony, supported by the diagnostic studies, more compelling.

Concerning the need for surgery, both Dr. Jones and Dr. Brophy disputed Dr. Crosby's conclusion that the facet joint "collapse" or fracture compressing the nerve root was caused by Mr. McCall's fall at work. Dr. Jones testified any facet joint fracture would have shown up on Mr. McCall's three cervical MRIs. Moreover, he testified the pressure on the nerve root from the fracture would have presented as radiculopathy on Mr. McCall's three EMGs following the injury. Dr. Jones testified he has performed

12

many cervical surgeries over the last forty years and, based on his experience, this type of fracture is "an immediate deal. And . . . you're going to see it on the MRI. And you're going to have a lot more pain than what we're talking about here."

Dr. Brophy agreed with Dr. Jones and testified there was "no evidence of trauma to the facet joint by MRI. So it wasn't related to the fall, whatever [Dr. Crosby] saw." He further explained, "The MRIs are quite sensitive to bone injury. There would be signal changes within the facet joint; and certainly if he had a clinical radiculopathy, Dr. Jones has seen thousands of those over the years and would have noted it."

Even Dr. Crosby agreed no MRI showed the facet joint collapse. He could not say *when* it happened and conceded that it could have happened *after* the workplace fall. Based on the totality of the proof, the Court finds Dr. Crosby's causation explanation speculative and Dr. Dalal's unpersuasive. Thus, the Court holds Mr. McCall's cervical condition and surgery did not primarily arise out of his work injury, and Mr. McCall did not successfully rebut the presumption afforded Dr. Jones' causation and impairment opinions. Thus, Mr. McCall did not meet his burden in establishing entitlement to any additional workers' compensation benefits by a preponderance of the evidence.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. McCall's request for workers' compensation benefits is denied.

2. Costs of $150.00 are assessed against Ferrell Paving Company under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2016), to be paid within five days of this order becoming final.

3. Absent an appeal of this order, it shall become final thirty days after issuance.

4. Ferrell Paving shall prepare and file a statistical data form (SD2) within ten business days of the date of this order under Tennessee Code Annotated section 50-6-244.

**ENTERED this the 26th day of July, 2018.**

**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

13

## APPENDIX

Stipulated Findings of Fact:

1. Mr. McCall sustained an injury by accident arising out of and in the course and scope of his employment on October 6, 2014.
2. Mr. McCall gave timely notice of his injury.
3. Mr. McCall is fifty-nine years old, a resident of Shelby County, and is a high school graduate.
4. Mr. McCall received authorized treatment from Concentra Medical Center, Dr. Riley Jones, Dr. Ronald Bingham (EMG), Worksite Consultants (FCE), and Occupation Health Centers (PT).
5. Dr. Jones concluded Mr. McCall reached maximum medical improvement on April 15, 2015.
6. Employer paid temporary total disability benefits from October 7, 2014, through February 5, 2015, in the total amount of $8,770.30.
7. Mr. McCall did not return to work for Ferrell Paving.
8. Mr. McCall's compensation rate is $507.39.

Exhibits:

1. Separation Notice
2. Select Staffing Employment Records
3. Ingersoll-Rand Employment Records
4. Concentra Medical Center-Medical Exam Report for Commercial Driver Fitness
5. Employer's Timeline of Events
6. Photo of debit card
7. Concentra Medical Records
8. Dr. Riley Jones' deposition
9. Dr. Brophy's deposition
10. Dr. Dalal's deposition
11. Dr. Crosby's deposition

Technical record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Order Setting Case for Show Cause Hearing
4. Order on Show Cause Hearing
5. Request for Initial Hearing
6. Initial Hearing Order (October 6, 2016)
7. Plaintiff's Motion to Continue Trial
8. Order Continuing Compensation Hearing and Setting for Status Hearing
9. Amended Scheduling Order

14

10. Plaintiff's Motion for Continuance
11. Order Granting Plaintiff's Motion for Continuance and Amended Scheduling Order
12. Plaintiff's Motion for Continuance
13. Response in Opposition to Plaintiff's Motion for Continuance
14. Order Denying Motion to Continue Compensation Hearing and Granting Extension of Certain Deadlines in Scheduling Order
15. Plaintiff's Pre-Trial Brief
16. Employer's Pre-Trial Brief
17. Employer's Witness List
18. Employer's Exhibit List
19. Pre-Compensation Hearing Statement
20. Dispute Certification Notice (post-discovery)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Order was sent to the following recipients by the following methods of service on this the 26th day of July, 2018.

| Name | Via Email | Service sent to: |
| --- | --- | --- |
| Steve Taylor, Employee's Counsel | X | staylor@tcmfirm.com |
| Paul Nicks, Employer's Counsel | X | pnicks@travelers.com |
| | X | llunaman@travelers.com |

*Penny Shrum by tw*

**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**